UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 07-294 (JRT/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION AND ORDER** |
| 01 - Keith David Rosenblum and 02 - Martin Wayne Meister, | |
| Defendants. | |

David M. Genrich, Assistant United States Attorney, for the Government.
Peter B. Wold, Esq., for Defendant Rosenblum.
William J. Mauzy, Esq., for Defendant Meister

**THIS MATTER** came before the undersigned United States Magistrate Judge on October 31, 2007, on Defendant Rosenblum's Motion to Suppress Evidence [#44], Defendant Rosenblum's Motion to Suppress Evidence [#45], Defendant Rosenblum's Motion to Dismiss for Lack of Jurisdiction [#46], Defendant Rosenblum's Motion to Dismiss [#48], Defendant Meister's Motion to Suppress Statements [#26], Defendant Meister's Motion for a Bill of Particulars [#30] and Defendant Meister's Motion to Suppress Evidence [#57]. At the hearing, the Court received testimony from FBI Special Agent Patricia A. Dietz ("Agent Dietz"), FBI Special Agent John Bonhage ("Agent Bonhage"), Leo Hermes from Metropolitan Council Environmental Services ("MCES"), Tim Rothstein from MCES, and John Lichter. Both parties submitted exhibits during the course of the hearing.[1] The matter was referred to the undersigned for Report and

---

[1] Government's Exhibit 1 is an FBI 302 Investigation Report by Special Agent Patricia A. Dietz; Government's Exhibit 2 is an FBI 302 Investigation Report by Special Agent John G. Bonhage; Government's Exhibit 3 is a Letter from the United States Attorney to Tim Rothstein; Defendants' Exhibit 1 is a time line written by Tim Rothstein of action taken in the investigation

Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Defendants' Motions be **DENIED**.

## I. FINDINGS OF FACT

### A. Background

Eco Finishing ("Eco") is a metal finishing business owned by Defendant Keith Rosenblum. Eco's plant has been managed by Defendant Martin Meister since 2004. (Compl. at ¶ 5.) The charges in this case resulted from an investigation into Eco's failure to comply with their water discharge permit by knowingly discharging water with levels of cyanide and other metals exceeding those allowed by the permit. Eco's wastewater is discharged into the state's sewer system and then flows to a publicly-owned treatment works ("POTW") where it is treated and then discharged into the Mississippi River.

Eco's wastewater permit was issued by MCES which operates several POTW's in the Minneapolis/St. Paul area. MCES's permit system requires the approval of the Environmental Protection Agency ("EPA"), pursuant to the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq*. The CWA provides for criminal sanctions for unauthorized discharges of wastewater, stating in relevant part that "[a]ny person who knowingly violates section . . .1317 . . . of this title . . . or any other requirement imposed in a pretreatment program approved under section 1342(a)(3) or

---

of ECO Finishing; Defendants' Exhibit 3 is an email written by Tim Rothstein to Ahto Niemioja on 03/25/2004; Defendants' Exhibit 4 is an email written by Ahto Niemioja to Keith at ECO Finishing on 03/25/2005; Defendants' Exhibit 6 is a set of copies of hand written notes of Tim Rothstein; Defendants' Exhibit 7 is a copy of an envelope addressed to Tim Rothstein, an internal memo from ECO Finishing and records of the levels of various metals in the water discharged by the company; Defendants' Exhibit 8 is a copy of water test results of water taken from the sewer near ECO Finishing's plant; Defendants' Exhibit 9 is an email to Tim Rothstein containing a summary of the test results; Defendants' Exhibit 10 is a memorandum written by Tim Rothstein; Defendants' Exhibit 11 is a telephone memo from Liesch Associates.

1342(b)(8) (governing State implementation of the pretreatment program) shall be punished by a fine of not less than $5,000 nor more than $50,000 per day of violation or by imprisonment for not more than 3 years, or by both." 33 U.S.C. § 1319(c)(2).

In the search warrant affidavit, EPA Agent Matt J. Lundeen stated that MCES employee Tim Rothstein told him that during the week of January 9, 2005, Jonathan Diehl, Eco's Environmental Manager, contacted Rothstein about concerns he had with Eco's wastewater treatment practices. (*See* Attach. 5 to Gov't Omnibus Response to Rosenblum's Pretrial Motions [#51].) The affidavit indicated that Diehl told Rothstein that "pretreatment violations documented during in-house monitoring were not reported to MCES, low pH wastewater was sometimes discharged without neutralization, the facility's cyanide destruction system was not working properly, and Rosenblum did not want to spend the money necessary to fix or maintain pretreatment equipment." (*Id*.) Diehl also provided Rothstein with charts created for Eco's internal use, listing the levels of various pollutants measured in Eco's wastewater. (*Id*. at 11.) The chart indicates that Eco violated acceptable levels of various pollutants at least one day each month between November 1, 2004 and January 13, 2005. (*Id*. at 11.) Eco was required to contact MCES when it went over acceptable levels of pollutants in its wastewater. (*Id*. at 13.) However, the Water Discharge Report for October through December 2004 which was submitted to MCES does not include the violations listed on the chart Eco created for internal use and MCES was not contacted about these violations. (*Id*.)

The internal chart for November 2004 to January 2005 also indicates that on the days MCES came to test the facility's water discharge, Eco shut down its cyanide system. Eco turned the system back on the day after MCES left the facility. (*Id.* at 16.) In the "comments" section of the chart, the

entry for January 4, 2005 states, "MCES sampling from 10 am til Friday." (*Id.*) The entry for January 5, 2005 states: "Cyanide system down for 3 days." (*Id.*) The entry for January 6, 2005 states: "MCES sampler inoperative." (*Id.*) The entry for January 7, 2005 states: "CN waters back on after MG sampling." (*Id.*) Diehl informed Lundeen that he believed "MG" was a clerical error, and should have read "MC" for "Met Council." (*Id.*) Internal sample results show cyanide violations for January 10, 2005 and January 12, 2005, just days after MCES sampling had been completed. (*Id.*)

Diehl also provided an internal summary chart for November 2004 indicating that the cyanide waters were turned off when MCES came to perform tests and were turned back on when MCES left. The chart records cyanide violations after MCES completed the monitoring project. (*Id.*)

Diehl also provided Rothstein with an internal memo dated January 4, 2005. (See Def. Ex. 7.) The subject of the memo is "Wastewater Compliance Monitoring by the Met Council." (*Id.*) The memo states in part: "We are being monitored by MCES until late Friday morning. To stay in compliance, I suggest we follow the list below." The memo then lists a number of steps to take to stay in compliance with wastewater discharge limits. (*Id.*)

The affidavit also describes evidence presented to Rothstein and Lundeen by another Eco employee named Tom Alexander. (*Id.* at 16.) Alexander described instances prior to those detailed by Diehl where Eco did not report cyanide levels exceeding those allowed by the Company's permit. (*Id.* at 17.) Alexander also told Rothstein and Lundeen that he was berated by Mr. Rosenblum for sending a letter to MCES reporting a cyanide spike that exceeded permit limits. (*Id.* at 18.) He also told them that when MCES was monitoring, he was told to shut the cyanide and chrome rinses off

and was not to dump any of the plating baths so that Eco would be in compliance with permit limits. (*Id*.)

In March 2005, government investigators executed a search warrant allowing them to conduct both overt and covert testing of Eco's wastewater. (*See* Attach. 5 to Gov't Omnibus Response to Rosenblum's Pretrial Motions [#51].) The overt testing was done by MCES under the guise that it was conducting its routine annual monitoring that it has performed at Eco in the past. (*Id*. at 19.) On April 19, 2005, government investigators executed a second search warrant at Eco's facility for books and records. (*See* Attach. 4 to Gov't Omnibus Response to Rosenblum's Pretrial Motions [#51].)

**B. Testimony**

**1. FBI Special Agent Patricia A. Dietz.**

FBI Special Agent Patricia A. Dietz (Agent Dietz), FBI Special Agent John Bonhage (Agent Bonhage) testified for the Government at a suppression hearing on October 31, 2007. Leo Hermes from MCES, Tim Rothstein from MCES, and John Lichter testified for the Defendants.

Agent Dietz has been working as a special agent with the FBI for 16 years investigating white collar crime. Agent Bonhage has been working as a special agent with the FBI for 12 years. Both agents were present for the execution of a search warrant at Eco Finishing on April 19, 2005.

Agent Dietz testified that during the execution of the warrant she was responsible for helping secure the facility, for conducting the search and for assisting with interviews. To secure the facility, she helped monitor the doors to ensure that no one came in or out during the search. She testified that there were about ten FBI agents present and ten agents total from the EPA and the

5

Minnesota Pollution Control Agency. At approximately 8:20 a.m., Agent Dietz, along with Environmental Protection Agency (EPA) Criminal Investigation Agent Chris Pullos, interviewed Defendant Meister in his office. Defendant Meister was seated at his desk and the agents were seated in chairs on the other side of the desk. Dietz testified that Meister was told he was not under arrest and that he was free to come and go while the search warrant was being executed. She testified that no one read Meister his *Miranda* rights because he was not under arrest. At approximately 8:30 a.m., Meister responded to an overhead page announcing that all managers were to meet immediately in the conference room. The agents followed Meister and waited for him to finish the meeting and then followed him back to his office. The interview resumed at approximately 8:43 a.m.

After a few minutes of resuming the interview, Defendant Rosenblum entered the office and the agents left so that Rosenblum and Meister could confer. Several minutes later, Rosenblum and Meister exited Meister's office and went into the main office area towards Rosenblum's office. Agents Dietz and Pullos followed the two men. Meister asked the agents if he could get a soda from the employee break room machine and the agents gave him permission. Then Meister went into Rosenblum's office for a telephone conference with an attorney, after which time he stated he would not answer any more questions. Agent Dietz testified that Meister was cooperative and that their interactions with him lasted around twenty-five minutes.

**2. FBI Special Agent John Bonhage.**

Agent Bonhage was a case agent for the FBI at the time of the April 15, 2005 search. During the search, it was his job to keep a log of the time at which events took place during the search. Agent Bonhage testified that the warrant to search Eco Finishing was executed at 8:02 a.m.

Bonhage testified that Agent Lundeen briefed the management of Eco Finishing that a search warrant was being executed and that no one was under arrest and requested that when people were interviewed by law enforcement officers, they should be truthful. In a second meeting with the rest of the company's employees, the same information was given and that interviews were voluntary and that if employees were going to talk with law enforcement officers, they should be truthful. He testified that there were between ten and fifteen employees present at the plant. Agent Bonhage testified that at 9:10 a.m., he learned that an attorney was on his way to the plant. Agent Bonhage did not participate in the interview with Defendant Meister. He testified that he may have told the Eco Finishing employees that they were free to leave, but he could not remember for certain. Bonhage was aware of one employee getting permission to leave but was not aware of any others leaving.

### 3. MCES Manager Leo Hermes.

Leo Hermes testified that he has been an industrial waste manager with MCES for 31 years. He testified that he currently manages thirty employees, most of whom are engineers. Hermes testified that one of his employees, engineer Tim Rothstein, has worked with Eco Finishing to ensure that the company is complying with its permit and other rules enforced by MCES. Hermes said that he first learned of Eco Finishing in the 1990's when it first applied for a permit. Hermes testified that he was contacted by Defendant Rosenblum's attorney's investigator, Bill O'Keefe and Hermes told him that it was not possible for O'Keefe to talk with Hermes' employees. On April 25, 2005, O'Keefe called Hermes again and requested to speak with his employees who worked with Eco Finishing. Hermes testified that he was advised internally that he and his staff could talk to investigators but they were not required to do so by MCES and that Hermes and his staff decided

not to talk to the investigator. Hermes also testified that the EPA said it would not tell them not to talk to an investigator. Hermes testified that in March of 2007, he told O'Keefe neither he nor his employees could talk to O'Keefe because Tim Rothstein had received a letter from the United States Attorney forbidding them to discuss the case.

Hermes testified that in January of 2005, his agency became aware of an anonymous tip that Eco Finishing was discharging too much waste in the water. Hermes testified that he passed this information on to Agent Lundeen at the EPA whom he knew from working together on previous cases. Hermes testified that his employees continued to meet with Eco Finishing and did not notify the company that there was a criminal investigation underway.

### 4. MCES Engineer Tim Rothstein.

Tim Rothstein is an engineer with MCES. He testified that he and his co-workers and manager decided internally that the best course of action for them to take was not to advise Eco Finishing that MCES was working with the EPA criminal division. Rothstein testified that Bill O'Keefe contacted him and requested to speak with him about the Eco Finishing case. Rothstein told him that he would have to talk to his manager. Hermes told Rothstein it was up to the individual whether or not he wanted to talk. Rothstein testified that there was an internal meeting in December of 2006 addressing whether or not MCES employees should talk to O'Keefe but Rothstein said that no group decision was made on the issue. The second time O'Keefe called, Rothstein told him that he did not want to talk. On March 2, 2007, Rothstein received a letter from the United States Attorney stating that he has been given access to grand jury materials and that unauthorized disclosure of grand jury materials is illegal. (*See* Gov't Ex. 3.) Rothstein testified that he had no further contact with O'Keefe after he received the letter. Rothstein drafted a

memorandum of a conversation he had with Defendant Meister on April 11, 2005. (Def. Ex. 10) In the memorandum, Rothstein stated he told Meister that MCES had not yet received the results of the tests done on Eco Finishing's wastewater in mid-March 2005. Rothstein testified at the hearing that, in actuality, when he spoke to Meister, he already had the test results and withheld them from Eco Finishing because of the ongoing civil and criminal investigation. Rothstein testified that before the search warrant was executed, he never told Eco Finishing or its employees that he was working with the EPA's Criminal Enforcement Division.

### 5. Environmental Consultant John Lichter.

John Lichter has been an engineer with Leish Associates since 1988. He testified that Eco Finishing hired his firm to aid the company in complying with the state's environmental regulations. Lichter testified that he also negotiated with the Minnesota Pollution Control Agency on Eco Finishing's behalf. On February 10, 2005, Lichter spoke with Rothstein on the telephone and Rothstein told him that Eco Finishing had no outstanding violation or enforcement actions.

## II. CONCLUSIONS OF LAW

### A. Defendant Rosenblum's Motion to Suppress Evidence [#44] or Dismiss [#48]

The Defendant makes three arguments in this motion: (1) that the Government violated the Defendant's rights by directing witnesses in the case to refrain from discussing the case with counsel for Defendant; (2) that the Government possesses documents protected by the attorney-client privilege which must be suppressed; and (3) that the Government's handling of the attorney-client privilege documents in this case violates the Defendant's Sixth Amendment right to effective assistance of counsel, requiring dismissal of the indictment.

### 1. Government's Alleged Misconduct in its Interactions with Witnesses

The Defendant alleges that the Assistant United States Attorney assigned to this case in early 2007, Bill Koch, directed the employees at Metropolitan Council Environmental Services ("MCES") not to speak with Bill O'Keefe, an investigator hired by Defendant's counsel.

"Witnesses to a crime are not the property of the prosecution or the defense and both sides have an equal right and should have an equal opportunity to interview them. However, it is equally true that a witness is not required by law to talk to either the prosecution or the defense attorneys prior to trial except under subpoena." *U.S. v. Long*, 449 F.2d 288, 295 (8th Cir. 1971).

In this case, the Defendants have failed to present evidence supporting their claim. At the hearing, Mr. Hermes testified that he decided not to talk to investigators but was never told by management or anyone else that he would not be able to do so. (Tr. at 56.) He testified that no one at the U.S. Attorney's Office advised him not to talk to defense investigators. (*Id*. at 68.) He also testified that EPA agent Matthew Lundeen never advised him that he should not talk. (*Id.*) He did testify that his employee Tim Rothstein received a Rule 6(e) letter from the U.S. Attorney's Office advising him that he had knowledge of evidence that was the subject of a grand jury investigation and that unauthorized disclosure of grand jury matters is punishable by contempt proceedings.

Tim Rothstein's testimony is consistent with that of Mr. Hermes. Rothstein testified that counsel for MCES told him that he and other employees could choose whether or not they wanted to talk to defense investigators. (Tr. at 79.) He also stated that he received the Rule 6(e) letter from the U.S. Attorney's Office. The Court recommends that the motion be denied because the testimony of Mr. Hermes and Mr. Rothstein supports the conclusion that no one at the U.S. Attorney's Office told the MCES employees not to speak with defense investigators apart from the standard Rule 6(e) letter sent to Rothstein. The letter cites to Federal Rule of Criminal Procedure 6(e)(3)(A)(ii) which

provides that "Disclosure of a grand-jury matter - other than the grand jury's deliberations or any grand juror's vote - may be made to any government personnel - including those of a state . . . that an attorney for the government considers necessary to assist in performing that attorney's duty to enforce federal criminal law . . . ." This rule also provides that individuals designated under 6(e)(3)(A)(ii) may generally not disclose a matter occurring before the grand jury. F.R.C.P. 6(e)(2)(B)(vii). The letter sent to Rothstein simply informs him of the law.

### 2. Government's Alleged Possession of Documents Protected by the Attorney-Client Privilege.

Defendant Rosenblum alleges that the Government has in its possession numerous documents seized from Eco that are protected by the attorney-client privilege. Rosenblum claims to have learned about the documents when it received discovery from the Government which included the documents allegedly protected by privilege. Rosenblum claims that even if the Court barred the Government from using the documents as evidence, the Government can still use the knowledge it has gained from reviewing the documents in its strategy and execution of the case which is a violation of the Rosenblum's Sixth Amendment rights. Rosenblum has also informed the Court it is submitting an updated privilege log.

To the extent that the Defendant seeks a ruling that documents he did not previously list on its October 2006 privilege log are privileged, the Court recommends that the motion be denied on the basis that the privilege has been waived. To the extent that the Government seeks production of documents that it claims the Defendant did not list on its October 2006 privilege log, the Court recommends that the Government may address that issue on an appropriate motion.

### B.   Defendant Rosenblum's Motion to Suppress Evidence [#45]/ Defendant Meister's Motion to Suppress Statements [#26]/ Defendant Meister's Motion

> **to Suppress Evidence [#57].**

The Defendants allege that the government agencies in this case were conducting a criminal investigation under the guise of a civil investigation in violation of the Defendants' Fourth Amendment and Due Process rights. The Defendants request that all evidence seized through the civil investigation and from the warrants issued based on evidence obtained in the civil investigation be suppressed.

The issue raised by this motion is at the intersection of civil and criminal enforcement of the law in a regulated industry. Citizens, including corporate citizens, who operate in a regulated industry, have an obligation to comply with regulatory requirements and are also subject to criminal penalties for violation of the criminal law. Owners and managers of businesses in regulated industries, like all citizens, enjoy the protection of the Constitution and the Bill of Rights. Courts have developed rules to ensure that Constitutional rights enjoyed by individuals are not violated by government abuse or exploitation of the individuals' obligations to comply with regulatory requirements.

In the Eighth Circuit, in the context of a civil tax audit that was referred to the Criminal Investigation Division of the IRS, the Court has stated the law as follows: "Evidence obtained in the course of a criminal investigation, where the defendant has not been apprised of the nature of the investigation, may be suppressed only if the defendant establishes that : (1) the IRS had firm indications of fraud by the defendant; (2) there is clear and convincing evidence that the IRS affirmatively and intentionally mislead the defendant; and (3) the IRS's conduct resulted in prejudice to the defendant's constitutional rights." *U.S. v. Grunewald*, 987 F.2d 531, 534 (8th Cir. 1993).

The issues here then are[2]: (1) Did MCES have firm indications of criminal activity by Defendants when it began its investigation? (2) Is there clear and convincing evidence that the MCES affirmatively and intentionally misled the Defendants? (3) Did the conduct of the MCES result in prejudice to the Defendants' constitutional rights?

1. **MCES had clear indication of criminal activity by Defendants when they began their investigation.**

Eco's former employee, John Diehl, clearly outlined a pattern of criminal efforts to evade the requirements of Eco Finishing's MCES permit and to fraudulently manipulate data to evade detection. Diehl's description of the facts is corroborated by former Eco employee Alexander and documents produced by Eco to MCES confirmed intentional criminal conduct.

2. **There is some evidence that MCES affirmatively and intentionally misled Defendants.**

First, MCES clearly lied to Defendants about the nature of the water sampling being done inside their plant in March of 2005. MCES told Defendants it was routine sampling being done in connection with routine monitoring of their water output. In fact, the sampling was being done pursuant to a search warrant to collect evidence in connection with a criminal investigation.

Second, Defendants rely upon two statements made by MCES's Rothstein, the individual most responsible for overseeing Eco Finishing's compliance with permit requirements. The first was a February 2005 statement Rothstein made to Eco Finishing's consultant, Lichter. Rothstein

---

[2] The Court rejects the Government's suggestion that the law in *U.S. v. Tweel*, 550 F.2d 297 (5th Cir. 1997) and *Grunewald* is limited to the tax context. We conclude that whenever there is a possible overlap between civil and criminal enforcement, the rule, as articulated in *Grunewald* applies. *Cf. United States v. Stringer*, 408 F.Supp.2d (D. Or. 2006) (applying the holding in *Tweel* to parallel civil and criminal investigations conducted by the Securities and Exchange Commission and the Department of Justice).

told Lichter that Eco had no outstanding violations or enforcement actions. This was a true statement. Rothstein had no obligation to unilaterally disclose the existence of an investigation under these circumstances. The second statement made was by Rothstein to Defendant Meister. In response to Meister's question about whether the results from the March testing were back from the lab, Rothstein affirmatively lied and told Meister that the lab results were not yet back, when in fact they were.

The law does not impose any obligation on investigators to disclose the existence of investigations, but does prohibit investigators from affirmatively misleading targets of investigations in ways that prejudice the target's constitutional rights. *See, e.g.*, *Tweel*, 550 F.2d at 300 (misled target of investigation consented to a search that would otherwise be governed by the Fourth Amendment); *Stringer*, 408 F.Supp.2d at 1089 (target of investigation made statements that were protected by the Fifth Amendment).

Here, it appears that MCES affirmatively lied to Defendant about the nature of the water sampling being done inside the plant and that Rothstein affirmatively lied to Defendant Meister about the status of the lab results. However, it does not appear that Rothstein lied to Lichter regarding the existence of enforcement actions.

**3. The actions of MCES did not result in prejudice to Defendants' constitutional rights.**

In order for an investigative agency's misleading acts to result in judicial sanction, there must be some evidence that the agency's conduct resulted in prejudice to the defendant's constitutional rights. *Grunewald*, 987 F.2d at 534. For example, in *Tweel*, the defendant consented to a search to which he might not have consented had he not been affirmatively misled by the IRS about the true nature of the investigation. 550 F.2d at 298. In *Stringer*, 408

F.Supp.2d at 1087, Defendant gave a compelled statement in the context of a civil SEC proceeding. *Id.* Had he not been affirmatively misled about the true nature of the investigation, he might have asserted his right under the Fifth Amendment not to make a statement. *Id.* In *United States v. Scrushy*, 366 F.Supp.2d 1134, 1140 (N.D. Ala. 2005), the defendant gave a deposition and tape recorded statement he might not have given if he had not been affirmatively misled.

### a. False statements regarding nature of water monitoring.

Here, Defendants can point to no constitutional right that was prejudiced by MCES's false statements regarding the nature of the water monitoring conducted in March 2005. This monitoring was authorized by search warrant and therefore the Defendant's Fourth Amendment rights were in no way compromised. The information acquired by search warrant in this case is different from the information collected in *Tweel* where the Defendant consented to a search thereby prejudicing his right to be free from unreasonable search and seizure. In this case, there is nothing the Defendants could have done (short of obstructing the investigation) to prevent the monitoring had they known of its true nature, whereas in *Tweel*, the defendant could have asserted his Fourth Amendment right not to consent to the search had he known the investigation was criminal in nature.

Moreover, unlike the defendant in *Stringer*, who could have asserted his Fifth Amendment right not to make the statement, there is no right the Defendants here could have exercised that would have changed the course of the investigation. It is true that had the Defendants known that the investigation was criminal in nature, they might have been able to insist on the issuance of a search warrant before allowing the monitoring otherwise used only for

15

civil monitoring purposes, to be collected for criminal enforcement.  However, the agents had already secured a search warrant and therefore nothing about the deception impacted the exercise of any constitutional right.

### b. Rothstein's false statements to Lichter and to Meister.

The statement to Lichter that there were no outstanding violations or enforcement actions was a true statement.  Under these circumstances, Rothstein had no affirmative obligation to disclose his knowledge of any ongoing investigation that had not produced any outstanding violations or enforcement actions.  Assuming, without deciding, that the statement was, under the circumstances, misleading, unlike in *Tweel*, Defendants here can point to no action they took or refrained from taking in reliance upon the statement to the detriment of any constitutional right.  In *Tweel*, in reliance upon the misleading statement that no criminal investigator had been assigned to what otherwise appeared to be a civil tax audit, the defendant consented to a search to which he might otherwise not have consented.

By the time that Rothstein made the false statement to Meister about the lab results, the criminal investigation was largely complete; the search warrant had been executed; and the tests performed in March had confirmed the information provided by former employees Diehl and Alexander.  There is no evidence that the false statement that the lab results were not back in any way impacted Defendants' ability to assert any constitutional right.  Neither Defendant relied upon this false statement to the detriment of any constitutional right.  The statements made at the time the second search warrant was executed on April 19, 2005 are in no way related to the false statement about the status of the test results.  In short, neither defendant took any action to the prejudice of his constitutional rights as a result of the MCES false statement regarding the status

of the test results.

### C. Defendant Rosenblum's Motion to Dismiss for Lack of Jurisdiction [#46]

The CWA regulates discharge of pollutants into "navigable waters." Navigable waters are defined in the statute as "waters of the United States." 33 U.S.C § 1362(7). In addition to navigable-in-fact waterways, the statute also regulates waters that have a significant effect on traditional navigable waters. The Defendant argues that the federal government exceeded its powers under the Commerce Clause in regulating Eco Finishing's water discharge because the company discharges to a state publicly-owned treatment works ("POTW") and not directly into the Mississippi. Because Eco's discharge flows into a state water treatment facility, the Defendant contends that the State of Minnesota, not the federal government, has jurisdiction over the case.

The Supreme Court most recently addressed what constitutes "navigable waters" under the CWA in, *Rapanos v. United States*, 126 S.Ct. 2208 (2006), a 4-4-1 plurality opinion. The controlling opinion in this case is Justice Kennedy's concurrence. *Northern California River Watch v. City of Healdsburg*, 457 F.3d 1023, 1029 (9th Cir. 2006) (citing *Marks v. United States*, 430 U.S. 188, 193 (1977) (explaining that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.")). Justice Kennedy took the view that wetlands at issue fell within the term "navigable waters" because they had a "significant nexus" to navigable-in-fact waterways. *Rapanos*, 126 S.Ct. at 2236. He concluded that a significant nexus exists "if the wetlands, either along, or in combination with similarly situated lands in the region, significantly affect the

chemical, physical and biological integrity of other covered waters more readily understood as 'navigable.'"[3] *Id.* at 2248.

In addressing the federalism or Commerce Clause concerns, Justice Kennedy wrote: "[t]o be sure, the significant nexus requirement may not align perfectly with the traditional extent of federal authority. Yet in most cases, regulation of wetlands that are adjacent to tributaries and possess a significant nexus with navigable waters will raise no serious constitutional or federalism difficulty." *Rapanos*, 126 S.Ct. at 2249. In this case, Eco's wastewater raises no serious Commerce Clause question because it meets the significant nexus test and has the potential to pollute the Mississippi in a manner that the CWA anticipated and developed a sophisticated permit system to prevent. 33 U.S.C. § 1317.

Here, Eco discharged its wastewater into a sewer which emptied into a POTW, which in turn, discharged treated water into the Mississippi. The waters feeding the POTW at issue "significantly affect the chemical, physical and biological integrity" of the Mississippi. This is evidenced by the fact that the statute itself requires "pretreatment" of waters flowing into a POTW in order "to prevent the discharge of any pollutant through treatment works, (as defined in section 1292 of this title) which are publicly owned, which pollutant interferes with, passes through, or otherwise is incompatible with such works." 33 U.S.C. § 1317(b)(1). "Pretreatment" means that a company like Eco may not exceed specified levels of certain

---

[3] The Government contends that *Rapanos* is limited to cases dealing with wetlands. The Court disagrees because Justice Kennedy adopts the "significant nexus" test from two prior Supreme Court cases, *Solid Waste Agency of Northern Cook Cty.*, 531 U.S. 159 (2001) ("*SWANCC*") and *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121 (1985). In *SWANCC*, the Supreme Court applied the test in a case involving abandoned sand and gravel pits that had filled with water. Thus, the Court concludes that the "significant nexus" test is not limited to cases involving wetlands.

chemicals in their wastewater. Eco deliberately discharged cyanide and other harmful chemicals in its wastewater at levels exceeding those allowed by its pretreatment permit. The pretreatment levels of cyanide and certain metals for Eco were set according to the standard in the statute - to prevent pollutants from passing through or damaging the POTW facility. Because the POTW in this case discharged into the Mississippi and Eco's practices either had the likelihood of passing through the POTW into the Mississippi or incapacitating the POTW, the Court recommends that Eco's water discharge should fall under the term "navigable waters."

### D.  Defendant Meister's Motion for a Bill of Particulars [#30]

The Indictment in this case is 15 pages. It contains a description of the statutory framework as well as a summary of the facts giving rise to the Indictment. The conspiracy count identifies the object of the conspiracy, describes the manner and means by which the conspiracy is alleged to have been carried out, and lists nine separate overt acts that the accused Defendants allegedly committed in furtherance of the conspiracy. The substantive Clean Water Act counts clearly set forth the details regarding the alleged violations, including the dates, the substance that is alleged to have been discharged, and the amount by which it is alleged that the discharge exceeded permitted limits. Counts 10 and 11 also clearly articulate how Defendants are alleged to have violated the permit conditions in violation of the Clean Water Act. Defendant Meister's Motion for a Bill of Particulars is denied.

### III.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Rosenblum's motions [#44, #45, #46 and #48] and Defendant Meister's motions [#26 and #57] be **DENIED**.

## IV. ORDER

Defendant Meister's motion for a Bill of Particulars [#30] is **DENIED**.

DATED: December 21, 2007                    s/ *Franklin L. Noel*
                                            FRANKLIN L. NOEL
                                            United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **January 11, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **January 11, 2008,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.