UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 07-294 (JRT/FLN) |
| Plaintiff, | |
| v. | **SUPPLEMENTAL REPORT AND RECOMMENDATION** |
| 01 - Keith David Rosenblum and<br>02 - Martin Wayne Meister, | |
| Defendants. | |

———————————————————————

David M. Genrich, Assistant United States Attorney, for the Government.
Peter B. Wold, for Defendant Rosenblum.
William J. Mauzy for Defendant Meister

———————————————————————

**THIS MATTER** came before the undersigned United States Magistrate Judge on October 31, 2007, on Defendants' pretrial motions. The Court addressed the Defendants' motions in a Report and Recommendation dated December 21, 2007 [#77]. The Court supplements its previous Report and Recommendation to address Defendant Meister's Motion to Suppress Statements [#26]. At the hearing, the Court received testimony from FBI Special Agent Patricia A. Dietz ("Agent Dietz"), FBI Special Agent John Bonhage ("Agent Bonhage"), which is relevant to this motion. Both parties submitted exhibits during the course of the hearing.[1] The matter was referred to the

---

[1] Government's Exhibit 1 is an FBI 302 Investigation Report by Special Agent Patricia A. Dietz; Government's Exhibit 2 is an FBI 302 Investigation Report by Special Agent John G. Bonhage; Government's Exhibit 3 is a Letter from the United States Attorney to Tim Rothstein; Defendants' Exhibit 1 is a time line written by Tim Rothstein of action taken in the investigation of ECO Finishing; Defendants' Exhibit 3 is an email written by Tim Rothstein to Ahto Niemioja

1

undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Defendant Meister's Motion be **DENIED**.

## I.   FINDINGS OF FACT

**A.  Background**

Eco Finishing ("Eco") is a metal finishing business owned by Defendant Keith Rosenblum. Eco's plant has been managed by Defendant Martin Meister since 2004. (Compl. at ¶ 5.) The charges in this case resulted from an investigation into Eco's failure to comply with their water discharge permit by knowingly discharging water with levels of cyanide and other metals exceeding those allowed by the permit. Eco's wastewater is discharged into state's sewer system and then flows to a publicly-owned treatment works ("POTW") where it is treated and then discharged into the Mississippi.

Eco's wastewater permit was issued by MCES which operates several POTW's in the Minneapolis/St. Paul area. MCES's permit system requires the approval of the Environmental Protection Agency ("EPA"), pursuant to the Clean Water Act, 33 U.S.C. § 1251 *et seq.* The CWA provides for criminal sanctions for unauthorized discharges of wastewater, stating in relevant part that "[a]ny person who knowingly violates section 1317 . . . of this title . . . or any other requirement imposed in a pretreatment program approved under section 1342(a)(3) or 1342(b)(8) (governing

---

on 03/25/2004; Defendants' Exhibit 4 is an email written by Ahto Niemioja to Keith at ECO Finishing on 03/25/2005; Defendants' Exhibit 6 is a set of copies of hand written notes of Tim Rothstein; Defendants' Exhibit 7 is a copy of an envelope addressed to Tim Rothstein, an internal memo from ECO Finishing and records of the levels of various metals in the water discharged by the company; Defendants' Exhibit 8 is a copy of water test results of water taken from the sewer near ECO Finishing's plant; Defendants' Exhibit 9 is an email to Tim Rothstein containing a summary of the test results; Defendants' Exhibit 10 is a memorandum written by Tim Rothstein; Defendants' Exhibit 11 is a telephone memo from Liesch Associates.

State implementation of the pretreatment program) shall be punishable by a fine of not less than $5,000 nor more than $50,000 per day of violation or by imprisonment for not more then 3 years, or by both." 33 U.S.C. § 1319(c)(3).

In the search warrant affidavit, EPA Agent Matt J. Lundeen stated that MCES employee Tim Rothstein told him that during the week of January 9, 2005, Jonathan Diehl, Eco's Environmental Manager, contacted Rothstein about concerns he had with Eco's wastewater treatment practices. (*See* Attach. 5 to Gov't Omnibus Response to Rosenblum's Pretrial Motions [#51].) The affidavit indicated that Diehl told Rothstein that "pretreatment violations documented during in-house monitoring were not reported to MCES, low pH wastewater was sometimes discharged without neutralization, the facility's cyanide destruction system was not working properly, and Rosenblum did not want to spend the money necessary to fix or maintain pretreatment equipment." (*Id*.) Diehl also provided Rothstein with charts created for Eco's internal use, listing the levels of various pollutants measured in Eco's wastewater. (*Id*. at 11.) The chart indicates that Eco violated acceptable levels of various pollutants at least one day each month between November 1, 2004 and January 13, 2005. (*Id*. at 11.) Eco was required to contact MCES when it went over acceptable levels of pollutants in its wastewater. (*Id*. at 13.) However, the Water Discharge Report for October through December 2004 which was submitted to MCES does not include the violations listed on the chart Eco created for internal use and MCES was not contacted about these violations. (*Id*.)

The internal chart for November 2004 to January 2005 also indicates that on the days MCES came to test the facility's water discharge, Eco shut down its cyanide system. Eco turned the system back on the day after MCES left the facility. (*Id.* at 16.) In the "comments" section of the chart, the

entry for January 4, 2005 states, "MCES sampling from 10 am til Friday." (*Id.*) The entry for January 5, 2005 states: "Cyanide system down for 3 days." (*Id.*) The entry for January 6, 2005 states: "MCES sampler inoperative." (*Id.*) The entry for January 7, 2005 states: "CN waters back on after MG sampling." (*Id.*) Diehl informed Lundeen that he believed "MG" was a clerical error, and should have read "MC" for "Met Council." (*Id.*) Internal sample results show cyanide violations for January 10, 2005 and January 12, 2005, just days after MCES sampling had been completed. (*Id.*)

Diehl also provided internal an internal summary chart for November 2004 indicating that the cyanide waters were turned off when MCES came to perform tests and were turned back on when MCES left. The chart records cyanide violations after MCES completed the monitoring project. (*Id.*)

Diehl also provided Rothstein with an internal memo dated January 4, 2005. (See Def. Ex. 7.) The subject of the memo is "Wastewater Compliance Monitoring by the Met Council." (*Id.*) The memo states in part: "We are being monitored by MCES until late Friday morning. To stay in compliance, I suggest we follow the list below." The memo then lists a number of steps to take to stay in compliance with wastewater discharge limits. (*Id.*)

The affidavit also describes evidence presented to Rothstein and Lundeen by another Eco employee named Tom Alexander. (*Id.* at 16.) Alexander described instances prior to those detailed by Diehl where Eco did not report cyanide levels exceeding those allowed by the Company's permit. (*Id.* at 17.) Alexander also told Rothstein and Lundeen that he was berated by Mr. Rosenblum for sending a letter to MCES reporting a cyanide spike that exceeded permit limits. (*Id.* at 18.) He also told them that when MCES was monitoring, he was told to shut the cyanide and chrome rinses off

and was not to dump any of the plating baths so that Eco would be in compliance with permit limits. (*Id.*)

In March 2005, government investigators executed a search warrant allowing them to conduct both overt and covert testing of Eco's wastewater. (*See* Attach. 5 to Gov't Omnibus Response to Rosenblum's Pretrial Motions [#51].) The overt testing was done by MCES under the guise that it was conducting its routine annual monitoring that it has performed at Eco in the past. (*Id.* at 19.) On April 19, 2005, government investigators executed a search warrant at Eco's facility for books and records. (*See* Attach. 4 to Gov't Omnibus Response to Rosenblum's Pretrial Motions [#51].)

**B. Testimony**

**1. FBI Special Agent Patricia A. Dietz.**

FBI Special Agent Patricia A. Dietz (Agent Dietz), FBI Special Agent John Bonhage (Agent Bonhage) testified for the Government at a suppression hearing on October 31, 2007.

Agent Dietz has been working as a special agent with the FBI for 16 years investigating white collar crime. Agent Bonhage has been working as a special agent with the FBI for 12 years. Both agents were present for the execution of a search warrant at Eco Finishing on April 19, 2005.

Agent Dietz testified that during the execution of the warrant she was responsible for helping secure the facility, for conducting the search and for assisting with interviews. (MH Tr. at 21.) To secure the facility, she helped monitor the doors to ensure that no one came in or out during the search. (MH Tr. at 32.) She testified that there were about ten FBI agents present and ten agents total from the EPA and the Minnesota Pollution Control Agency. At approximately 8:20 a.m.,

Agent Dietz, along with Environmental Protection Agency (EPA) Criminal Investigation Agent Chris Pullos, interviewed Defendant Meister in his office. Defendant Meister was seated at his desk and the agents were seated in chairs on the other side of the desk. Dietz testified that Meister was told he was not under arrest and that he was free to come and go while the search warrant was being executed. (MH Tr. at 23.) She testified that no one read Meister his *Miranda* rights because he was not under arrest. At approximately 8:30 a.m., Meister responded to an overhead page announcing that all managers were to meet immediately in the conference room. (MH Tr. at 24; Gov't Ex. 1.) The agents followed Meister and waited for him to finish the meeting and then followed him back to his office. The interview resumed at approximately 8:43 a.m. (Gov't Ex. 1.)

After a few minutes of resuming the interview, Defendant Rosenblum entered the office and the agents left so that Rosenblum and Meister could confer. (MH Tr. at 24.) Several minutes later, Rosenblum and Meister exited Meister's office and went into the office area towards Rosenblum's office. (Gov't Ex. 1.) Agents Dietz and Pullos followed the two men. (*Id.*) Meister asked the agents if he could get a soda from the employee break room machine and the agents gave him permission. (*Id.*) Then Meister went into Rosenblum's office for a telephone conference with an attorney, after which time he stated he would not answer any more questions. (*Id.*) Agent Dietz testified that Meister was cooperative and that their interactions with him lasted around twenty five minutes. (MH Tr. at 25.)

   **2. FBI Special Agent John Bonhage**.

Agent Bonhage was a case agent for the FBI at the time of the April 15, 2005 search. (MH Tr. at 44.) During the search, it was his job to keep a log of the time at which events took place during the search. (*Id.*) Agent Bonhage reported that the warrant to search Eco Finishing was

6

executed at 8:02 a.m. (Gov't Ex. 2.) Bonhage testified that Agent Lundeen briefed the management of Eco Finishing that a search warrant was being executed; that no one was under arrest; that any interviews conducted by agents were voluntary; and that if one chose to engage in an interview, it was important to be truthful. (MH Tr. at 44-45.) Among those present at this meeting was Defendant Meister. (*Id*.) In a second meeting with the rest of the company's employees, the same information was given: that no one was under arrest; that interviews were voluntary; and, that if employees were going to talk with law enforcement officers, they should be truthful. (MH Tr. at 45-46.) Defendant Meister was also present at this meeting and advised the employees to be open and honest with law enforcement. (MH Tr. at 46.) He testified that there were between ten and fifteen employees present at the second meeting. (MH Tr. at 46.) Agent Bonhage testified that at 9:10 a.m., he learned that an attorney was on his way to the plant. (MH Tr. at 47.) Agent Bonhage did not participate in the interview with Defendant Meister. (MH Tr. at 48.) He testified that he may have told the Eco Finishing employees that they were free to leave, but he could not remember for certain. (MH Tr. at 49.) Bonhage was aware of one employee getting permission to leave but was not aware of any others leaving. (MH Tr. at 50.)

## II.  CONCLUSIONS OF LAW

**Defendant Meister's Statements Should not Be Suppressed.**

Defendant Meister contends that his statements made to Agent Dietz and Agent Pullos during the execution of a search warrant at Eco Finishing on April 19, 2005, should be suppressed because they were made during a custodial interrogation without a *Miranda* warning.

In order to succeed in suppressing his statements, Defendant must show that he was taken into custody and subjected to interrogation. *See Miranda*, 384 U.S. at 477-78. Whether a defendant

7

is in custody is determined by examining the objective circumstances of the situation, using the perspective of a reasonable person in the suspect's position. *See Berkemer v. McCarty*, 468 U.S. 420, 442 (1984); U.S. v. Johnson, 64 F.3d 1120, 1125 (8th Cir. 1995). Courts must consider the totality of the circumstances when making this determination. *See California v. Beheler*, 463 U.S. 1121, 1125 (1983).

In *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990), the Court of Appeals for the Eighth Circuit stated that "the relevant factors to be considered in making a determination of custody include an accused's freedom to leave the scene, and the purpose, place, and length of the interrogation." The accused's freedom of action during the interrogation is a critical factor, while the remaining factors "have inconclusive, independent relevance to the determination of custody." *Id.* The Eighth Circuit developed a six-factor test for determination of custody. *Id.* at 1349. These factors are:

1. Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

2. Whether the suspect possess unrestrained freedom of movement during questioning;

3. Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

4. Whether strong arm tactics or deceptive stratagems were employed during questioning;

5. Whether the atmosphere of the questioning was police dominated; and

6. Whether the suspect was placed under arrest at the termination of the questioning.

The Eighth Circuit has recognized that, while these factors are important, "[t]he ultimate inquiry

must always be whether the defendant was restrained as though he were under formal arrest. And the court must consider whether the *historical facts*, as opposed to the one-step removed *Griffin* factors, establish custody. The debatable marginal presence of certain judicially-created factors that ostensibly tend to aggravate the existence of custody cannot create the functional equivalent of formal arrest where the most important circumstances show its absence." *United States v. Czichray*, 378 F.3d 822, 828 (8th Cir. 2004).

### 1.     Advice Given by the Agents.

The Defendant was told twice by SA Matthew Lundeen that he was not under arrest and that interviews with law enforcement were voluntary. Defendant Meister was present at two meetings conducted by SA Matthew Lundeen, one with Eco Finishing managers and one with Eco Finishing employees, where he announced that a search warrant was being executed at Eco Finishing, that no one was under arrest and that interviews were voluntary. At the meeting with the employees, Defendant Meister himself announced to the employees to be open and honest. At the hearing SA Dietz testified that Meister was free to come and go from his office during her and SA Pullos' brief interview with him (MH Tr. at 23-24.) and that the Defendant did in fact leave his office more than once during the interview.

In *Griffin*, the Eighth Circuit observed that "[t]he most obvious and effective means of demonstrating that a suspect has not been taken into custody . . . is for the police to inform the suspect that an arrest is not being made and that the suspect may terminate the interview at will." 922 F.2d at 1349.

### 2.     Restraint.

The Defendant argues that he was in custody and therefore should have been read his

*Miranda* rights in part because the agents followed him when he exited his office during the interview to attend a meeting of the managers and second to attend a meeting in Mr. Rosenblum's office. The Eighth Circuit has held that it is not reasonable for an individual to conclude that law enforcement officers are restricting his movement when the officers escort him during the execution of a search warrant; rather such monitoring protects the officers and "the integrity of the search." *U.S. v. Axom*, 289 F.3d 496, 503 (8th Cir. 2002).

In *Axom*, law enforcement officers executed a search warrant on the defendant's home to seize evidence in a child pornography investigation. *Id*. at 497. The defendant's home contained a number of weapons. *Id*. During the course of an interview with the defendant and while the search warrant was being executed, a male law enforcement officer accompanied the defendant to his bedroom so that he could put clothes on and an officer also accompanied him to the bathroom. *Id*. at 498. The officers also provided a glass of water to the defendant rather than having the defendant retrieve it himself. *Id*. The court concluded that "[f]rom an objective viewpoint, a reasonable person in Axom's shoes should have realized the agents escorted him not to restrict his movement, but to protect themselves and the integrity of the search." *Id*. at 503.

Similarly, in this case, a reasonable person in the Defendant's shoes should have realized that the officers were accompanying the Defendant to protect the integrity of the pending search and generally to ensure officer safety. Law enforcement officers were seizing evidence while this interview was being conducted and it was certainly possible that any of the employees, including the Defendant, might attempt to destroy evidence. Furthermore, as Officer Dietz testified, when a search warrant is being conducted, officers monitor individuals' movements because "not everyone is cooperative in a government search warrant." (MH Tr. at 32.)

### 3. Who Initiated Contact.

Agents Dietz and Pullos initiated the interview with the Defendant after he had been present at two meetings where SA Lundeen stated to the Defendant and other employees that no one was under arrest; that all interviews were voluntary; and that it was important to be truthful with law enforcement officers.

### 4. Tactics Used.

The *Griffin* court also considered whether the interviewing agents used strong arm tactics or deceptive stratagems. *Griffin*, 922 F.2d at 1351. Here, the agents did not use strong arm tactics or deceptive stratagems. At no time did the agents threaten to use force. The officers conducted the brief interview with the Defendant in his office and freely allowed the Defendant to interrupt the interview twice and, finally, to end it after he spoke with Keith Rosenblum in Rosenblum's office.

### 5. Domination of Interview.

The *Griffin* court also observed that an "interrogation which occurs in an atmosphere dominated by the police . . . is more likely to be viewed as custodial than one which does not." *Griffin*, 922 F.2d at 1351-52. The Defendant contends that the interview was conducted in a police dominated environment because twenty federal and state law enforcement agents were conducting a search of Eco Finishing during the interview and that, upon arrival, the agents made sure that no one left the building. However, the interview was conducted "on [the Defendant's] own turf." *U.S. v. Rorex*, 737 F.2d 753, 756-57 (8th Cir. 1984) (holding that an interview conducted at defendant's place of business during the execution of a search warrant was non-custodial). In *Rorex*, the court draws a distinction between interviews conducted in familiar surroundings and those that take place at the station house or "even the vacant office in the back of the bank building that was the scene

of the interview in our recent decision in *U.S. v. Dockery*, 736 F.2d 1232, 1233 (8th Cir. 1984)." 737 F.2d at 756. The court found that interviews conducted in more familiar surroundings were less likely to appear to the reasonable person to be custodial interrogations.

The court concludes that the presence of law enforcement at Eco Finishing did not render this interview more likely to be viewed as custodial. The Defendant was free to start and stop the interview as he chose and he was told twice by SA Lundeen that neither he nor any of the other employees were under arrest. The Defendant was also on his own turf.

### 6. **Placement Under Arrest.**

The Defendant was not placed under arrest at the termination of his interview. In fact, the Defendant chose to end the interview after speaking privately with Keith Rosenblum.

### 7. **Totality of the Circumstances**.

The totality of the circumstances indicate that the Defendant was not the subject of a custodial interrogation. He was told not once, but twice that neither he nor any of the other employees were under arrest and that any interviews conducted with law enforcement officers were voluntary. The Eighth Circuit has stressed more than once that where law enforcement officers explain to an individual that an interview is voluntary, it is a strong indication that the interview is not custodial. *See Griffin*, 922 F.2d at 1349; *U.S. v. Czichray*, 378 F.3d 822, 826 (8th Cir. 2004) ("We believe that this abundant advice of freedom to terminate the encounter should not be treated merely as one equal factor in a mulit-factor balancing test designed to discern whether a reasonable person would have understood himself to be in custody.").

Furthermore, even though Agents Dietz and Pullos followed the Defendant when he stopped the interview, the officers still freely allowed the Defendant to start and stop the interview when

needed and did not object or protest when the Defendant decided to end the interview. The court therefore concludes that the interview was not custodial

### III. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant Meister's Motion to Suppress Statements [#26] be **DENIED**.

DATED: January 16, 2008                                          s/ *Franklin L. Noel*
                                                                 FRANKLIN L. NOEL
                                                                 United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 5, 2008**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **February 5, 2008,** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.