## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Criminal No. 07-294 (JRT/FLN) |
| Plaintiff, | |
| v. | **ORDER AFFIRMING MAGISTRATE JUDGE'S ORDER AND ADOPTING REPORT AND RECOMMENDATION WITH MODIFICATIONS** |
| (1) KEITH DAVID ROSENBLUM, and (2) MARTIN WAYNE MEISTER, | |
| Defendants. | |

David M. Genrich, Assistant United States Attorney, **OFFICE OF THE UNITED STATES ATTORNEY**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Peter B. Wold, **PETER B. WOLD, P.A.**, 247 Third Avenue South, Minneapolis, MN 55415, for defendant Keith Rosenblum.

William J. Mauzy, **LAW OFFICES OF WILLIAM J. MAUZY**, 510 First Avenue North, Suite 610, Minneapolis, MN 55403, for defendant Martin Meister.

Defendants Keith Rosenblum and Martin Meister have been charged with conspiracy to violate the Clean Water Act, violations of the Clean Water Act, violations of permit conditions, and tampering with monitoring devices. Before the Court are defendant Rosenblum's motions to suppress evidence and to dismiss the indictment, and defendant Meister's motion to suppress statements. In a Report and Recommendation dated December 21, 2007, United States Magistrate Judge Franklin L. Noel

recommended that this Court deny defendants' motions.[1]  Defendants and the prosecution have each objected to the Report and Recommendation.[2]  The Court has conducted a *de novo* review of those objections pursuant to 28 U.S.C. § 636(b)(1)(C) and D. Minn. LR 72.2(b).  For the reasons discussed below, the Court adopts the Report and Recommendation with modifications.

**BACKGROUND**

Defendant Keith Rosenblum is the President and Chief Executive Officer of Eco Finishing ("Eco"), a metal finishing business involved in the plating, polishing, and coating of various metal products.  Defendant Martin Meister has served as Eco's Plant Manager since 2004.  Eco's metal finishing process results in large quantities of industrial wastewater, which is discharged into the state's sewer system and then flows to a publicly-owned treatment works, or "POTW."  There, the wastewater is treated and discharged into the Mississippi River.

Eco maintained a discharge permit authorizing limited wastewater discharges.  Eco's permit was issued by Metropolitan Council Environmental Services ("MCES"), which operates several POTW's in the Twin Cities metropolitan area.  Under the Clean Water Act, the MCES permit system requires approval of the Environmental Protection

---

[1] The Magistrate Judge issued a Supplemental Report and Recommendation on January 16, 2008, recommending that this Court deny defendant Meister's motion to suppress statements (Docket No. 26) and providing detailed discussion in support of that recommendation.

[2] The Magistrate Judge also issued an Order denying defendant Meister's motion for a bill of particulars (Docket No. 30).  Meister has not objected to the Magistrate Judge's Order, and the Court affirms the Order without further discussion.

Agency, or EPA.   33 U.S.C. §§ 1251 *et seq.*   The Clean Water Act also provides for criminal sanctions for the unauthorized discharge of wastewater.   *See* 33 U.S.C. § 1319(c)(2).   The charges in this case stem from an investigation into Eco's failure to comply with its water discharge permit by knowingly discharging water containing levels of cyanide and other metals exceeding the permit limits.

In March 2005, government investigators executed a search warrant at Eco.   The accompanying search warrant affidavit included statements of EPA agent Matt J. Lundeen.   Lundeen stated that MCES employee Tim Rothstein told him that Eco's Environmental Manager, Jonathan Diehl, contacted Rothstein in January 2005 about concerns he had with Eco's wastewater treatment practices.   According to the affidavit, Diehl told Rothstein that pretreatment violations documented during in-house monitoring were not reported to MCES, that low pH wastewater was sometimes discharged without neutralization, that Eco's cyanide destruction system was not working properly, and that defendant Rosenblum did not want to spend the money necessary to fix or maintain pretreatment equipment.

Diehl also provided Rothstein with Eco's internal chart showing that Eco had violated acceptable pollutant levels between November 2004 and January 2005, and that Eco had not reported these violations to MCES.   The internal chart also suggested that Eco shut down its cyanide system on days when MCES came to conduct testing at Eco. The affidavit also describes evidence of Eco's permit and reporting violations that was presented to Rothstein and Lundeen by Eco employee Tom Alexander.   Alexander told Rothstein and Lundeen that he was berated by Rosenblum for sending a letter to MCES

reporting a cyanide spike that exceeded permit limits, and that he had been told to shut off the cyanide and chrome rinses when MCES was monitoring so that Eco would be in compliance with permit limits.

Agents executed the March 2005 warrant and conducted both overt and covert testing of Eco's wastewater.  MCES performed overt testing under the guise of routine annual monitoring.   On the morning of April 19, 2005, government investigators executed a second search warrant at Eco's facility to search for books and records.  FBI Special Agent Patricia A. Dietz testified before the Magistrate Judge that she helped secure Eco's facility during the search by monitoring the doors to prevent anyone from entering or leaving the facility.  Approximately ten FBI agents and ten agents from the EPA and the Minnesota Pollution Control Agency were present at Eco during the search.

At about 8:20 a.m., Dietz and an EPA agent interviewed defendant Meister in his office.  Meister was seated at his desk, with the two agents seated across from him. Meister was told he was not under arrest and was free to come and go while the search was conducted.  Meister was not read his *Miranda* rights.  At about 8:30 a.m., Meister responded to an overhead page announcing that all managers were to meet immediately in the conference room.  The two agents accompanied Meister to the conference room, waited for him to finish the meeting, and then followed him back to his office.  The interview resumed at approximately 8:43 a.m.

Several minutes later defendant Rosenblum entered the office.  The agents left the office so that Rosenblum and Meister could confer.  Rosenblum and Meister then exited Meister's office and went into the main office area toward Rosenblum's office.  Meister

asked the agents if he could get a soda from the employee break room machine and the agents gave him permission.  Meister then went into Rosenblum's office.  Meister and Rosenblum conferred with an attorney over the telephone, after which time Meister stated he would not answer any more questions.  Agent Dietz testified that their interactions with Meister lasted about twenty-five minutes, and that Meister remained cooperative during that time.

FBI agent John Bonhage also testified before the Magistrate Judge.  Bonhage testified that during the search Agent Lundeen briefed Eco management that a search warrant was being executed, that no one was under arrest, and that people should be truthful when they were interviewed by law enforcement officers.  Lundeen briefed Eco employees in a second meeting, telling them that they were not under arrest, that interviews with law enforcement were voluntary, and that employees should be truthful if they talked with law enforcement officers.  Bonhage testified that he may have told Eco employees that they were free to leave but he could not remember for certain.

MCES manager Leo Hermes testified that he was twice contacted by Bill O'Keefe, an investigator for defendant Rosenblum's attorney.  Hermes told O'Keefe that it was not possible to speak with Hermes' employees at MCES.  Hermes testified that he had been advised internally that he and his staff could talk to investigators, but that they were not required to do so.  Hermes and his staff decided not to speak with investigators. Hermes also testified that the EPA had said that it would not forbid Hermes and his staff from speaking with investigators.  In March 2007, Hermes told O'Keefe that he and his

staff could not speak with him because MCES had received a letter from the United States Attorney forbidding them to discuss the case.

Hermes also testified that in early 2005, MCES had become aware of Eco's permit violations through an anonymous tip. MCES employees continued to meet with Eco and did not notify the company that a criminal investigation was underway. MCES engineer Rothstein testified that MCES decided internally not to advise Eco that MCES was working with the EPA criminal division. O'Keefe also contacted Rothstein and asked to speak with him about the Eco case. Rothstein told him he would have to talk to his manager. Hermes told Rothstein that it was up to each individual whether to speak with investigators. When O'Keefe called Rothstein a second time, Rothstein told him that he did not want to talk. On March 2, 2007, Rothstein received a letter from the United States Attorney stating he had been given access to grand jury materials and that unauthorized disclosure of such materials is illegal. Rothstein testified that he had no further contact with O'Keefe after he received this letter.

Rothstein drafted a memorandum of a conversation he had with defendant Meister on April 11, 2005. In the memorandum, Rothstein stated that he told Meister that MCES had not yet received the results of testing done on Eco's wastewater in mid-March 2005. Rothstein testified that in fact he had all or nearly all of the test results at the time he spoke with Meister. Rothstein also testified that he was working with the EPA at that

time and had decided not to advise Eco of this fact.[3]   Prior to the execution of the search warrants at Eco, Rothstein never told Eco or its employees that he was working with EPA's criminal enforcement division.

On August 22, 2007, the prosecution filed an indictment against defendants Rosenblum and Meister alleging conspiracy to violate the Clean Water Act, violations of the Clean Water Act, violations of permit conditions, and tampering with monitoring devices.[4]   Defendant Rosenblum filed motions to suppress evidence and to dismiss the indictment.   Rosenblum argued that the government illegally directed witnesses to refrain from speaking with defense counsel, that the government possesses documents protected by the attorney-client privilege, and that its procurement and handling of such documents violates Rosenblum's Sixth Amendment right to effective assistance of counsel, requiring dismissal.   Rosenblum also argued that government agencies violated his constitutional rights by conducting a criminal investigation in the guise of routine annual monitoring. Finally, Rosenblum filed a motion to dismiss the indictment for lack of jurisdiction.   The Magistrate Judge recommended that this Court deny each motion.

---

[3] The prosecution objects to the Magistrate Judge's finding that Rothstein "withheld [test results] from Eco Finishing because of the ongoing civil and criminal investigation."   (Report and Recommendation at 9.)   The prosecution argues that Rothstein's testimony is, at best, unclear on this point, such that there is little or no direct evidence that Rothstein intentionally misled defendants about the nature of the investigation.   The Court finds that Rothstein's testimony supports a reasonable inference that Rothstein's decision not to disclose his cooperation with EPA's investigation influenced his decision not to disclose the fact that he had already received test results when he spoke with Meister.   The Court therefore overrules the prosecution's factual objection.

[4] The prosecution filed a superseding indictment in this case on January 23, 2008, which sets forth the same substantive allegations against defendants.

Defendant Meister filed a motion to suppress statements and to suppress evidence.[5]  Meister argued that his interview at Eco with government agents constituted custodial interrogation, and that the agents therefore violated the Fifth Amendment by failing to read Meister his *Miranda* rights.  The Magistrate Judge recommended that Meister's motions be denied.  Rosenblum, Meister, and the prosecution have each filed objections to the Report and Recommendation.   The Court now turns to these objections.

## ANALYSIS

## I.   DEFENDANT ROSENBLUM'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

### A.   **Rosenblum's Motions to Suppress Evidence and to Dismiss** (Docket Nos. 44 and 48)

Rosenblum filed motions to suppress evidence and to dismiss the indictment, arguing in part that the government directed witnesses not to speak with defense counsel. Specifically, Rosenblum alleged that an Assistant United States Attorney directed MCES employees not to speak with defense counsel's investigator.  It is well-settled that both the prosecution and the defense "have an equal right and should have an equal opportunity to interview [witnesses to a crime]."  *United States v. Long*, 449 F.2d 288, 295 (8th Cir. 1971).  "[A] defendant is entitled to have access to any prospective witness." *United States v. Walton*, 602 F.2d 1176, 1179 (4th Cir. 1979).  At the same time, a witness

---

[5] Meister has not objected to the Magistrate Judge's recommendation that the Court deny his motion to suppress evidence [Docket No. 57].  The Court adopts the recommendation and denies the motion without further discussion.

is not *required* to talk to either the prosecution or the defense prior to trial, except under subpoena. *Long*, 449 F.2d at 295.

The Magistrate Judge recommended that Rosenblum's motion be denied because the record did not support his allegation that an AUSA directed MCES employees not to speak with the defense. Indeed, Hermes testified at the motion hearing that *he* had decided not to speak with defense investigators, and that he was never told by anyone that he could not speak with investigators. Rothstein testified that MCES counsel told him that he and other employees could choose whether to talk with defense investigators. Both Hermes and Rothstein testified that Rothstein received a Rule 6(e) letter from the United States Attorney advising him that he had knowledge of evidence that was the subject of a grand jury proceeding, and that unauthorized disclosure of grand jury matters is illegal. *See* Fed. R. Crim. P. 6(e)(3)(A)(ii).

The Court agrees that the record contains no evidence to support Rosenblum's contention that MCES employees were instructed not to speak with the defense investigator. Rosenblum's objections fail to point to any specific evidence in the record to the contrary. The Court therefore denies Rosenblum's motions to the extent they allege the prosecution illegally prevented MCES employees from speaking with the defense.

Rosenblum also argues that the government possesses documents protected by the attorney client privilege and that the government's procurement and handling of privileged documents violates his Sixth Amendment right to effective assistance of counsel. In October 2005, the prosecution received a log of privilege claims from

counsel for Eco Finishing regarding a grand jury subpoena. The October 2005 log included only redacted copies of documents that were identified in the log as privileged. In November 2006, after Rosenblum retained new counsel, the prosecution received a new privilege log of documents that Rosenblum and Eco assert are privileged. The November 2006 log asserted privilege claims to various documents that had not been identified as privileged in the previous October 2005 log. The November 2006 log also made no claim of privilege as to materials that had been previously identified as privileged in the October 2005 log.

"Voluntary disclosure is inconsistent with the confidential attorney-client relationship and waives the privilege." *In re Grand Jury Proceedings*, 841 F.2d 230, 234 (8th Cir. 1988). Thus, attorney client privilege is waived by the prior disclosure of privileged documents, even where the disclosure was made by a former counsel. *Id.* at 233-34 and n.4; *In re Grand Jury Investigation of Ocean Transp.*, 604 F.2d 672, 674 (D.C. Cir. 1979) ("Privilege claims cannot be reopened by retaining new counsel who read the privilege rules more broadly than did their predecessor.").

The Court finds that Rosenblum's former counsel waived the attorney-client privilege when it voluntarily disclosed unredacted documents to the prosecution in the October 2005 log. Rosenblum cannot now assert a claim of attorney-client privilege with respect to those disclosed documents. Rosenblum objects that the Magistrate Judge failed to consider that the prosecution is presently using documents that were claimed as privileged in the October 2005 log. However, Rosenblum points to no evidence suggesting that the prosecution possesses or has used any documents protected by the

original October 2005 assertion of privilege.[6]   The Court therefore denies Rosenblum's

motions to suppress and to dismiss.

**B.      Rosenblum's Motion to Suppress Evidence** (Docket No. 45)

Rosenblum objects to a limited portion of the Report and Recommendation with

respect to his motion to suppress evidence.   Specifically, Rosenblum argues that the

Magistrate Judge erred by concluding that the government's failure to apprise him of the

criminal nature of its investigation did not prejudice his constitutional rights.   The

prosecution also objects to the Report and Recommendation on grounds that the

Magistrate Judge applied the wrong legal framework for evaluating Rosenblum's motion

to suppress.

The Magistrate Judge determined that the framework prescribed by the Eighth

Circuit in *United States v. Grunewald*, 987 F.2d 531 (8th Cir. 1993), should apply in cases

in which there is possible overlap between civil and criminal enforcement actions.

*Grunewald* addressed whether the Internal Revenue Service could use evidence obtained

during a criminal investigation where the defendant-taxpayer had not been apprised of the

criminal nature of the investigation.   *Id.* at 534.   The court held that such evidence may be

suppressed where "1) the IRS had firm indications of fraud by the defendant, 2) there is

clear and convincing evidence that the IRS affirmatively and intentionally misled the

defendant, and 3) the IRS's conduct resulted in prejudice to defendant's constitutional

---

[6] To the extent the prosecution requests production of documents that were originally
claimed as privileged in October 2005, but that were not claimed as privileged in the November
2006 log, the Court agrees that the request should be denied.

rights." *Id.*   The Magistrate Judge rejected the prosecution's contention that *Grunewald* should not be extended beyond the context of civil tax audits.   The Magistrate Judge went on to find that while there were strong indications of defendants' criminal activity and evidence that MCES misled the defendants, Rosenblum had not demonstrated that MCES's conduct violated his constitutional rights, thus failing to satisfy *Grunewald*'s third prong.

Rosenblum argues in his objections that the government's failure to disclose the true nature of its criminal investigation in this case prejudiced his due process rights. However, Rosenblum fails to explain how his due process rights were prejudiced, that is, how those rights would have been exercised or otherwise protected had the government not concealed the fact of its criminal investigation.   Although MCES made false statements regarding the nature of its water monitoring, it had a search warrant supported by probable cause to conduct the monitoring.   Because the government had a valid warrant, even if defendants had known of the criminal nature of the investigation they could not have exercised their Fourth Amendment right to refuse consent to the search, short of obstructing the investigation.   *Cf. United States v. Tweel*, 550 F.2d 297, 298 (5th Cir. 1997) (finding prejudice where the defendant consented to a search to which he may not have otherwise consented had the government not misled him about the nature of the investigation).   Nor is there any evidence that defendants acted, or refrained from acting, to the detriment of their constitutional rights as a result of Rothstein's false statements regarding the status of test results.   The Court thus agrees with the well-reasoned

recommendation of the Magistrate Judge that Rosenblum has not shown prejudice to his constitutional rights. The Court therefore denies Rosenblum's motion to suppress.

Finally, the prosecution objects to the application of *Grunewald* in this case,[7] arguing that the three-part test in *Grunewald* is appropriately limited to cases where the investigating government agency has distinct and separate divisions for civil audits and criminal investigations. The prosecution argues that this is not a case in which a "civil" arm of MCES conducted "civil" monitoring to gather evidence for a criminal investigation, or where parallel civil proceedings were conducted to gather evidence in civil discovery for use in a covert criminal investigation. *See, e.g.*, *United States v. Stringer*, 408 F. Supp. 2d 1083, 1089-90 (D. Or. 2006) (dismissing indictment where government conducted criminal investigation under the guise of a SEC civil proceeding). Rather, MCES has the authority under the Clean Water Act to monitor a regulated entity's compliance with its wastewater discharge permits, the violation of which can result in civil or criminal sanctions. *See* 33 U.S.C. § 1319(b), (c).

The three-part test in *Grunewald* is based on a concern that "[s]ignificantly different rights, responsibilities, and expectations apply to civil audits and criminal tax investigations." 987 F. 2d at 534. The Court agrees with the prosecution that these differences are likely most pronounced in situations in which the investigating agency has separate branches with authority to institute distinct civil and criminal investigations. The Court is not persuaded, however, that a similar concern does not also exist where the

---

[7] The prosecution objects only to the legal basis used by the Magistrate Judge to reach his decision. The prosecution does not object, however, to the Magistrate Judge's substantive recommendation that the Court deny Rosenblum's motion.

agency exercises overlapping civil and criminal functions.  Here, the MCES conducted routine annual testing and monitoring to ensure Eco's compliance with its discharge permit, the violation of which could lead to either a civil action or criminal penalties.  33 U.S.C. § 1319(b), (c).  Eco managers would likely have different expectations, and may decide to exercise their constitutional rights, if they had known that MCES's annual testing was conducted not as a routine check-up but for purposes of an undercover criminal investigation.  At least one other court has applied a similar constitutional framework in the context of a criminal investigation by EPA investigators.  *See United States v. Mitchell*, 763 F. Supp. 1262, 1268-69 (D. Vt. 1991), *rev'd on other grounds*, 966 F.2d 92 (2d Cir. 1992).[8]   For these reasons, the Court overrules the prosecution's objections and finds that *Grunewald* is applicable in this case.

### C. **Rosenblum's Motion to Dismiss for Lack of Jurisdiction** (Docket No. 46)

Rosenblum filed a motion to dismiss the indictment for lack of jurisdiction, arguing that the federal government exceeded its jurisdiction under the Clean Water Act (CWA) by regulating Eco's wastewater discharge into a sewer.  Rosenblum argued that Eco's discharge into a sewer system which flows to a state POTW cannot be federally regulated as "navigable waters" under the CWA.

The Magistrate Judge disagreed.  Relying on Justice Kennedy's concurring opinion in *Rapanos v. United States*, 126 S. Ct. 2208 (2006), the Magistrate Judge

---

[8] The Second Circuit upheld the legal framework applied by the district court but ultimately found that the EPA investigators did not affirmatively mislead the defendants as to the true nature of their criminal investigation.  *Mitchell*, 966 F.2d at 100.

interpreted the CWA's definition of "navigable waters" to include waters with a "significant nexus" to navigable-in-fact waterways. *See id.* at 2236.  In *Rapanos*, Justice Kennedy wrote that a significant nexus exists "if the wetlands, either alone or in combination with similarly situated lands in the region, significantly affect the chemical, physical, and biological integrity of other covered waters more readily understood as 'navigable.'"  *Id.* at 2248.  The Magistrate Judge determined that Eco's discharge into a sewer, which empties into a POTW, and which in turn empties into the Mississippi River, "significantly affects" the chemical, physical, and biological integrity of the Mississippi River.  Thus, the Magistrate Judge found that Eco's wastewater discharge has a "significant nexus" to the Mississippi River and is subject to federal regulation under the CWA.

Both Rosenblum and the prosecution object to this portion of the Report and Recommendation.  Rosenblum's objections repeat the same arguments he raised before the Magistrate Judge in support of his motion to dismiss.  The prosecution argues that the Court need not determine whether Eco's wastewater discharge into a sewer system is subject to federal regulation as "navigable waters" under the CWA.  That statutory term applies only to direct discharges into "navigable waters."  Instead, the prosecution contends, separate provisions of the CWA govern indirect pretreatment wastewater discharges into sewer systems and treatment plants.  According to the prosecution, the enforcement of these pretreatment regulatory provisions does not require proof that a discharge was made into or affected the waters of the United States.  Thus, while federal jurisdiction over direct discharges is limited by the statutory definition of "navigable

waters," the appropriate framework for evaluating the federal government's power under the CWA to regulate indirect pretreatment discharges into sewer systems and POTWs is provided by the Commerce Clause.

The Court agrees with the prosecution.  Section 301(a) of the CWA prohibits the "discharge of any pollutant by any person" unless in compliance with other sections of the Act.  33 U.S.C. § 1311(a).  The CWA requires National Pollutant Discharge Elimination System (NPDES) permits for discharges into "navigable waters," which are statutorily defined as "waters of the United States."  33 U.S.C. §§ 1342(a)(4), 1362(7).  The CWA creates permitting schemes for discharges into waters of the United States, authorizing the Army Corps of Engineers and the EPA to issue permits for such discharges.  33 U.S.C. §§ 1344(a), 1342.  Pursuant to that authority, both the Corps and EPA have promulgated regulations defining the term "waters of the United States."

But the CWA also creates a separate statutory scheme for those pollution sources that discharge not directly into navigable waters, but indirectly into sewer systems and POTWs.  33 U.S.C. § 1317(b)(1); *see also E.P.A. v. City of Green Forest*, 921 F.2d 1394, 1398 (8th Cir. 1990) (discussing the distinct statutory and regulatory schemes applicable to direct discharges into navigable waters and indirect discharges into POTWs); *Am. Coke and Coal Chems. Inst. v. E.P.A.*, 452 F.3d 930, 933 (D.C. Cir. 2006) (same).  The CWA directs EPA to promulgate regulations establishing "pretreatment standards" for these indirect discharges into POTWs, and prohibits discharges in violation of any such pretreatment standards.  33 U.S.C. §§ 1317(b)(1), (d).  As such, the Court finds that the regulation of indirect discharges into POTWs that feed into navigable waterways does not

implicate the scope or interpretation of the statutory term "navigable waters." To the extent *Rapanos* addressed whether the CWA's definition of "navigable waters" extended to wetlands that are not in fact navigable, the Court agrees that the "significant nexus" test does not provide the appropriate framework for evaluating jurisdiction in this case. *See Rapanos*, 126 S. Ct. at 2236 (Kennedy, J., concurring) (stating the issue before the Court as "whether the term 'navigable waters' in the Clean Water Act extends to wetlands that do not contain and are not adjacent to waters that are navigable in fact").

Instead, Rosenblum's motion to dismiss for lack of jurisdiction requires the Court to determine whether regulation under the CWA of indirect discharges into a POTW that feeds into a navigable waterway exceeds Congress's power to regulate interstate commerce under the Commerce Clause. *See* U.S. Const. Art. I, § 8, cl. 3. The Commerce Clause gives Congress the power to regulate channels of interstate commerce, instrumentalities of interstate commerce, and those activities that substantially affect interstate commerce. *United States v. Lopez*, 514 U.S. 549, 558-59 (1995); *United States v. Trotter*, 478 F.3d 918, 920-21 (8th Cir. 2007). Once this power is established, "the only remaining question for judicial inquiry is whether 'the means chosen by Congress [are] reasonably adapted to the end permitted by the Constitution.'" *Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S. 264, 276 (1981) (quoting *Heart of Atlanta Motel, Inc. v. United States*, 379 U.S. 241, 262 (1964)).

It is well-settled that Congress has broad authority under the Commerce Clause to regulate activities that cause water pollution and that may have interstate effects. *See, e.g.*, *Hodel*, 452 U.S. at 282 ("[T]he power conferred by the Commerce Clause [is] broad

enough to permit congressional regulation of . . . air or water pollution . . . that may have effects in more than one State."). In regulating indirect wastewater discharges into sewers, "Congress recognized that the pollutants which some indirect dischargers release into POTWs could interfere with the operation of the POTWs, or could pass through the POTWs without adequate treatment." *City of Green Forest*, 921 F.2d at 1398. Here, Eco discharges industrial wastewater into sewers, which is then treated at a POTW and discharged directly into the Mississippi River, a navigable interstate waterway. The Court finds that the authority to regulate such indirect discharges is a valid exercise of the Commerce Clause power, as a regulation either of a channel of interstate commerce or of an activity that substantially affects interstate commerce. *See United States v. Hartsell*, 127 F.3d 343, 348-49 (4th Cir. 1997) (upholding CWA's regulation of indirect pretreatment discharges into POTWs as a valid exercise of Congress's Commerce Clause powers).

The Court further finds that the CWA's pretreatment permitting scheme for indirect dischargers into POTWs is reasonably related to Congress's authority to protect navigable interstate waterways themselves. *United States v. Deaton*, 332 F.3d 698, 707 (4th Cir. 2003) (stating that "[t]he power over navigable waters also carries with it the authority to regulate nonnavigable waters when that regulation is necessary to achieve Congressional goals in protecting navigable waters"). Indirect dischargers are required under the CWA to reduce wastewater pollutant levels through treatment prior to discharge in order "to prevent the discharge of any pollutant through [POTWs] . . . [that] interferes with, passes through, or otherwise is incompatible with such works." 33

U.S.C. § 1317(b)(1).   These requirements are reasonably related to the protection of interstate waterways.

The Court therefore concludes that regulation under the CWA of indirect wastewater discharges into POTWs, which are in turn discharged directly into navigable waters, is soundly within Congress's Commerce Clause power.   For the reasons stated above, the Court modifies the Report only to the extent that it relies on the "significant nexus" test to reach this conclusion.   The Court adopts the Magistrate Judge's recommendation and denies Rosenblum's motion to dismiss the indictment for lack of jurisdiction.

## II.   MEISTER'S OBJECTIONS TO THE REPORT AND RECOMMENDATION

Defendant Meister filed a motion to suppress statements (Docket No. 26), arguing that certain statements were made during a custodial interrogation without a *Miranda* warning.   Applying the six-factor test under *United States v. Griffin*, 922 F.2d 1343, 1348 (8th Cir. 1990), the Magistrate Judge recommended this Court deny the motion in a Supplemental Report and Recommendation dated January 16, 2008.   Meister has now objected to the Supplemental Report and Recommendation.

"The basic rule of *Miranda* is that an individual must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time a person is taken into custody for questioning."   *Griffin*, 922 F.2d at 1347 (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).   "*Miranda* accordingly requires that a warning as to the availability of the privilege against self-incrimination and to the

assistance of counsel be issued *prior to questioning* whenever a suspect is (1) interrogated (2) while in custody." *Id.* (emphasis in original).

An individual need not be formally arrested to be "in custody" within the meaning of the *Miranda* decision. "Custody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way." *Id.* (emphasis in original). To determine whether an individual is "in custody," the "relevant factors . . . include an accused's freedom to leave the scene, and the purpose, place, and length of the interrogation." *Id.* at 1348. The accused's freedom of action during the interrogation is a critical factor, while the remaining factors "have inconclusive, independent relevance to the determination of custody." *Id.* The Eighth Circuit has established a six-factor test for the determination of custody, including:

(1)     Whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

(2)     Whether the suspect possessed unrestrained freedom of movement during questioning;

(3)     Whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions;

(4)     Whether strong arm tactics or deceptive stratagems were employed during questioning;

(5)     Whether the atmosphere of the questioning was police dominated; or,

(6)     Whether the suspect was placed under arrest at the termination of the questioning.

*Griffin*, 922 F.2d at 1349.

The first three indicia are "mitigating factors," the presence of one or more of which "would tend to mitigate the existence of custody at the time of the questioning." *Id.* The final three indicia are "coercive factors," the presence of one or more of which would tend to compel a finding of custody. *Id.* While each of these factors may be relevant to a determination of custody, "[t]he ultimate inquiry must always be whether the defendant was restrained as though he were under formal arrest." *United States v. Czichray*, 378 F.3d 822, 828 (8th Cir. 2004).

The Magistrate Judge applied the six *Griffin* factors and concluded that defendant Meister was not in custody. The Court agrees. With respect to the three mitigating factors, Meister was twice told by Special Agent Lundeen that he was not under arrest and that the interviews were voluntary. *See Griffin*, 922 F.2d at 1349 (stating that such actions are the "most obvious and effective means of demonstrating that a suspect has not been taken into custody"). The record does not affirmatively establish that Meister was told he was free to leave. However, Meister did in fact leave his office more than once during the interview, and there is no evidence that the officers restrained him during questioning.

Although Meister was accompanied by agents when he exited his office to attend meetings with Eco management and with Rosenblum, the record shows that other law enforcement officers were conducting the search and seizing evidence at the same time these interviews were being conducted. Further, the accompanying agents waited for Meister during these meetings and allowed him to confer in private with Rosenblum. The Court finds that a reasonable person would conclude that the agents acted to protect

the integrity of the on-going search, rather than to restrain him from leaving the premises. In addition, Meister remained cooperative throughout the interviews and voluntarily acquiesced to the agents' requests. Meister himself announced to Eco employees during one meeting that employees should be open and honest with law enforcement.

As to the three coercive factors under *Griffin*, the agents did not use strong arm tactics or deceptive strategems during questioning, and at no time threatened to use force against Meister. The interviews were relatively brief. Indeed, the entire interaction, including both interviews, lasted only about twenty-five minutes. Because twenty federal and state law enforcement officers were present at Eco to conduct the search, the Court finds that the atmosphere was police dominated. However, the fact that the interviews were conducted at defendant's place of business and on his "own turf," *United States v. Rorex*, 737 F.2d 753, 756-57 (8th Cir. 1984), mitigates to some extent the atmosphere of police domination during questioning. Finally, the record shows that the officers did not arrest Meister when he decided to terminate the interview.

Applying the six *Griffin* factors, the Court concludes that Meister was not in custody during the two interviews with law enforcement. The Court therefore denies Meister's motion to suppress statements made during the interviews.

### ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      The Magistrate Judge's Order [Docket No. 77] is **AFFIRMED**.

**IT IS HEREBY FURTHER ORDERED** that defendant Rosenblum's objections [Docket No. 79] are **OVERRULED**, the prosecution's objections [Docket No. 80] are **SUSTAINED in part**, and the Magistrate Judge's Report and Recommendation dated December 21, 2007 [Docket No. 77] is **ADOPTED with modifications**.  Accordingly,

1.     Defendant Rosenblum's Motions to Suppress Evidence and to Dismiss [Docket Nos. 44, 48] are **DENIED**.

2.     Defendant Rosenblum's Motion to Suppress Evidence [Docket No. 45] is **DENIED**.

3.     Defendant Rosenblum's Motion to Dismiss for Lack of Jurisdiction [Docket No. 46] is **DENIED**.  The Court modifies the Report only to the extent it relies on the "significant nexus" test to uphold federal jurisdiction in this case.

**IT IS FURTHER HEREBY ORDERED** that defendant Meister's objections [Docket Nos. 81, 88] are **OVERRULED**, and the Court the Magistrate Judge's Supplemental Report and Recommendation [Docket No. 83] is **ADOPTED**. Accordingly, defendant Meister's motions to suppress statements and evidence [Docket Nos. 26, 57] are **DENIED**.

DATED:    March 3, 2008                          _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                       United States District Judge